UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NIKIMIA PATTERSON,                                           :

                Plaintiff,                  :        13 Civ. 4386 (GWG)

    -v.-                                                :        OPINION & ORDER

CAROLYN W. COLVIN,                                          :
Acting Commissioner of Social Security,
                                                           :
                Defendant.
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

    Plaintiff Nikimia Patterson brings this action pro se pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security

denying her claims for Disability Insurance Benefits and Supplemental Security Income ("SSI")

under the Social Security Act.  The Commissioner has moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  Patterson has not responded to

the motion.  For the reasons stated below, the Commissioner's motion is granted.

I.      BACKGROUND

    A.    Patterson's Claim for Benefits and Procedural History

    Patterson applied for disability benefits on November 5, 2010, and for SSI benefits on

November 12, 2010, alleging that she became disabled on July 16, 2008.  See Administrative

Record, filed Nov. 21, 2013 (Docket # 10) ("R."), 79, 248-65.  She was insured for benefits

through December 31, 2012.  R. 79.  Patterson was born on October 31, 1971, R. 248, and has

most recently worked as a home health aide, R. 89.

    On February 23, 2011, the Commissioner denied Patterson's application for disability

and SSI benefits.  R. 182-87.  Patterson requested a hearing before an administrative law judge

("ALJ").  R. 188-91.  The ALJ held a hearing on February 1, 2012.  R. 158-78.  On April 5,

2012, the ALJ issued a decision finding that Patterson was not disabled.  R. 79-91.  Patterson

appealed the ALJ's ruling to the Appeals Council, R. 72, but her request for review was denied

on April 22, 2013, R. 1-4.

On June 24, 2013, Patterson filed the instant pro se lawsuit seeking review of the ALJ's

decision under 42 U.S.C. §§ 405(g) and 1383(c)(3).  See Complaint, filed June 24, 2013 (Docket

# 2).  The Commissioner moved for judgment on the pleadings.  See Notice of Motion, filed

Nov. 21, 2013 (Docket # 11); Memorandum of Law in Support of the Commissioner's Motion

for Judgment on the Pleadings, filed Nov. 21, 2013 (Docket # 12) ("Gov't Mem.").  When

Patterson failed to respond, the Court issued an order sua sponte extending her time to do so.

See Order, filed Jan. 2, 2014 (Docket # 16).  Notwithstanding this Order, Patterson has filed no

papers in opposition to the Commissioner's motion.  The parties consented to this matter being

decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  See Consent to

Proceed Before United States Magistrate Judge, filed Jan. 30, 2014 (Docket #18).

On March 10, 2014, this Court issued an order requesting the parties to provide

additional briefing on three issues: (1) whether the ALJ satisfied his duty to develop the record;

(2) whether the ALJ gave proper consideration to Patterson's right knee medical condition; and

(3) whether the Appeals Council failed to consider additional evidence supplied by Patterson.

See Order, filed Mar. 10, 2014 (Docket # 19) ("Order").  The Commissioner addressed these

issues in a letter dated March 17, 2014.  See Letter, filed Mar. 19, 2014 (Docket # 21) ("3/17/14

Letter").  Patterson did not respond to this Order.

      B.     The Administrative Record

The Commissioner has provided a summary of the medical evidence contained in the administrative record.  See Gov't Mem. at 2-12.  Patterson has not contested the Commissioner's summary of this evidence.  Having examined the administrative record, the Court adopts the Commissioner's summary as accurate and complete for purposes of the issues raised in ths suit.  We discuss the portions of the record pertinent to the adjudication of this case in section III below.

      C.     The ALJ Hearing

At the hearing before the ALJ on February 1, 2012, Patterson testified that she lives in an apartment with her five children, who range in age from seven to nineteen.  R. 162.  Patterson has a high school diploma, id., and has previously worked as a home health aide and certified nursing assistant, R. 163-64.  To receive the certification to become a nursing assistant, she took a six-week training course in which she obtained "basic knowledge of the nursing field, temperatures, ADL's, and basic care for . . . senior citizens, elderly, and young people."  R. 164.  She also took a three-week course to receive her certification to become a home health aide.  Id.  Patterson testified that she had been driven to the hearing that day but that she is capable of traveling by bus or subway by herself.  R. 163.

When asked to describe her alleged disability, Patterson explained: "The left knee.  It twisted as I was coming up from performing one of my duties, and I — it twisted and I felt a pop and then it swelled up, and then I had to call my job, and explain to them the situation that happened, and then they told me to just go straight to the emergency room."  R. 164.  The injury occurred on July 16, 2008, and Patterson stated that afterwards she was not able to return to her job.  R. 165.  However, she babysat for several months so that she had some income.  Id.

3

Patterson testified that she had received a "same day operation" for her left knee injury performed by Dr. Michael Palmeri on June 10, 2009, and that she was considering undergoing a second surgery for that knee.  R. 166-67.  She explained that Dr. Palmeri and his assistant Richard Cohen had recommended the second surgery because "there is [sic] degenerate changes in the knee and [she] now [has] an ACL tear, and they need to — they want to go back in to repair it."  R. 167.  Patterson stated, "I also have the form of osteoarthritis that is forming in the knee, and I have a degree of joint damage."  Id.  Patterson has not been prescribed a cane or walking device, but she keeps a cane in her house that she uses periodically.  R. 168.  She also testified that she no longer goes to physical therapy, but she still regularly sees Dr. Palmeri.  Id.  When asked by the ALJ if Dr. Palmeri had given her any medications, Patterson replied that she takes Percocet to treat the pain and Mobic for the inflammation.  Id.  She described the pain in her left knee as follows: "It's sharp and it's constant.  Every day it's a little different, and some days it's more than the other . . . . Some days it's a little pain, and some days, like today, I got up and it was raining.  It was throbbing bad."  R. 169.  When then asked if the Percocet helped, Patterson responded, "[i]t doesn't like take the pain away right away . . . [but] when the Percocet kicks in then I'm fine."  Id.

As to any possible mental impairment, Patterson testified that she is not receiving any psychiatric treatment.  R. 165.  She stated that she has never been hospitalized for mental health issues and that she is not currently seeing any mental health professional or taking any medication in order to treat those issues.  R. 166.  Patterson also said that she is getting along well with her children and that she has a "couple" of friends.  R. 165-66.

Patterson testified that she had been seeing Dr. Sana Bloch because she had been having "terrible headaches," but Dr. Bloch had not been able to "pinpoint exactly where they were

4

coming from, and what type of headaches they were." R. 169. Dr. Bloch had given Patterson medication for the headaches, but she stopped taking the medication because the headaches "pretty much seem to come and go." R. 169-70.

The ALJ questioned Patterson about her daily activities. She testified: "I have five children. So my day starts off that I have to get up at 5:30 in the morning. My son has to catch a bus by 6:42. So I have to get him up, dressed, and out of the house on the bus, and then the rest of the kids, they are high school students. So they get themselves off, and then I have to walk my daughter to school." R. 170. Her daughter's school is three blocks from Patterson's home. Id. When her children are at school Patterson generally stays at home and rests. Id. When asked who cleaned the house, Patterson responded, "[w]ell, when the kids come home . . . they have the chores to do. I mean, I cook. I do the cooking but I have, you know, all the kids. So they participate in the cooking . . . And I do as much cleaning as I . . . can do that doesn't involve bending. As long as it doesn't involve the bending I can do it." Id. Patterson further explained, "[t]he bending is excruciating pain for me, and I get down there I can't get up. So if I bend down I need help to get up." Id.

Patterson generally does not have problems walking, but she sometimes has to tolerate knee pain when walking. R. 171. When asked whether she has any problem walking three blocks back and forth when she takes her daughter to school, Patterson replied, "sometimes it takes me longer to get to the school, but I just take my time to get there." Id. Patterson reported that she does not have any problems standing or lifting or carrying things. Id. Additionally, she reported having "just a little pain sitting." Id.

Finally, Patterson informed the ALJ that she was also planning to have surgery on her right knee. Id. When asked whether she had suffered the right knee injury in the same accident

5

as the left knee injury, she replied, "[i]t's two different.  I think it's just a period of time with the bending and stuff from working as a home health aide.  So I have a meniscus tear in my right knee."  R. 171-72.  The ALJ then asked Patterson when the right knee injury appeared, to which Patterson responded, "[t]hat started maybe like six months ago, and I went to physical therapy with my regular physician for that."  R. 172.  Additionally, Patterson stated that she has been seeing a different doctor, whom she identified as "Dr. Sotelo," to treat the right knee injury.  Id.

The ALJ noted that there was nothing in Patterson's medical history record pertaining to the right knee injury.  Id.  He asked Patterson for Dr. Sotelo's contact information so that he could subpoena Patterson's medical record from him.  R. 174.  Patterson told the ALJ that she would fax him Dr. Sotelo's contact information.  Id.  The Administrative Record indicates that on February 10, 2012, Patterson faxed the ALJ a document in which she wrote the address and full name of "Dr. Danilo Sotelo."  R. 1222.  On February 16, 2012, the ALJ issued a subpoena to Dr. Sotelo ordering him to produce Patterson's medical record.  R. 1223-24.  Dr. Sotelo did not respond to the subpoena.  R. 79.

A vocational expert, Raymond Cestar, relied on the Dictionary of Occupational Titles ("DOT") to testify that Patterson has past relevant work as a certified nursing assistant, a home health aide, and a babysitter, and that all of these are categorized as medium exertion jobs. R. 175-76.  Cestar assessed that "a person with the same age, education, and past relevant work [as Patterson] . . . [who] is capable of performing the exertional demands of the full range of light and sedentary work with no significant bending or stooping" would not be able to perform any of Patterson's past relevant work.  R. 176.  However, Cestar testified that a hypothetical person with such restrictions could perform the following jobs: a clerical worker, which is an unskilled sedentary job of which there are approximately 6,500 positions in the local economy

6

and 100,000 positions nationally; an assembler, which is a sedentary and unskilled job with 2,600 positions in the local economy and 229,000 in the national economy; an order clerk, which is a sedentary and unskilled job with 6,000 positions in the local economy and 200,000 in the national economy; a mail clerk, which is a light exertion and unskilled job with 7,000 positions in the local economy and 119,000 in the national economy; a fast food worker, which is a light exertion and unskilled job with 58,000 positions in the local economy and 2.6 million in the national economy; and a cashier, which is a light exertion and unskilled job with 97,000 positions in the local economy and 3.3 million in the national economy.  R. 176-77.

        D.       The ALJ's Decision

 On April 5, 2012, the ALJ issued a decision denying Patterson's request for benefits. R. 79-91.  The ALJ found that Patterson suffers from the following severe impairments: "left knee medial and lateral meniscal tear, a Grade III chondral injury patella and lateral tibial plateau, synovitis and left knee cyst with partial tear ACL and anterior horn of the lateral meniscus . . . and headaches."  R. 81.  The ALJ found that Patterson's depression is a non-severe impairment that "has not resulted in any significant mental limitations."  R. 83.  The ALJ determined that none of Patterson's impairments or combination of impairments "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Id.  Specifically, the ALJ determined that her knee impairment does not meet listing 1.02A because "her ability to walk has not been markedly affected."  Id.

Next, the ALJ found that Patterson retains "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) but that she cannot engage in any significant bending or stooping."  Id.  In reaching this finding, the ALJ explained that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." Id. Specifically, the ALJ noted that he relied on Patterson's subjective complaints as well as her self-reported description of her daily activities in concluding that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms [but that Patterson's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 84. The ALJ stated that he relied on the following medical evidence in reaching his findings: the treating reports from psychiatrist Dr. Francisco Rodriguez, a consultative psychiatric examination performed by Dr. Dmitri Bougakov, treating reports from orthopedic surgeon Dr. Paul Kleinman, an October 2008 MRI of Patterson's left knee, reports from Dr. Imelda Cruz-Banting, treating reports from Dr. Michael Palmeri, reports from orthopedic surgeon Dr. Isaac Cohen, a report from Dr. Sana Bloch, reports completed by the Federation Employment Guidance Service ("F.E.G.S.") medical team, and the consultative physical examination completed by Dr. Barbara Akresh. R. 82, 84-89.

Finally, the ALJ relied on the hearing testimony of the vocational expert to find that Patterson is unable to perform any of her past relevant work as a certified nursing assistant, home health aide, or babysitter because these are all medium exertion jobs. R. 89. However, he then determined that "[c]onsidering [Patterson's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Patterson] can perform" including clerical worker, assembler, and order clerk. R. 90. Thus, the ALJ concluded that Patterson is not disabled. R. 90-91.

E.      The Proceeding Before the Appeals Council

On June 11, 2012, Patterson submitted to the Appeals Council a request for review of the ALJ's decision.  R. 72.  Patterson subsequently sent the following additional evidence to the Appeals Council in accordance with 20 C.F.R. § 404.976(b).  R. 6-11, 15-71, 74-75, 96-151.

1.      Additional Evidence

The earliest records that Patterson submitted to the Appeals Council were those compiled by F.E.G.S.  Specifically, Patterson submitted a F.E.G.S. Biopsychosocial Summary report, R. 104-26, two F.E.G.S. Clinical Review Team Summary reports, R. 127-145, and a F.E.G.S. Medical Report to Physician, R. 146-151.  We do not describe the contents of these additional F.E.G.S. reports because they are largely cumulative of the earlier F.E.G.S. reports that had been considered by the ALJ.

Next, Patterson submitted a report dated May 10, 2012, that had been created by Dr. Gabriel Dassa at Medalliance Medical Health Services.  R. 74-75.  In the section of the report entitled "History of Present Illness," Dr. Dassa wrote:

> 40 yo female who presents for eval of right knee pain.  She sustained a left knee injury in 7/16/08 while performing her duties as a home attendant.  She had 2 surgeries on her left knee by Dr. Palmieri [sic].  She began feeling right knee pain in the right knee after surgery with favoring.  The pain became severe in 2009 and now is causing severe dysfunction.  She had an MRI of the right knee on 7/11/11.  This study documents a tear of the lateral meniscus.  She comes in today for right knee pain.

R. 74.  After examining Patterson, Dr. Dassa made the following findings.  There was swelling in the right knee, but the range of motion for flexion and extension was normal for both knees. Id.  Patterson tested positive on the Apley's compression test for the left knee but not for the right knee.  Id.  Patterson's general appearance was normal and was active, alert, and oriented to time, place, and persons.  Id.  Additionally, her judgment and insight were normal, and she was

9

able to walk without assistance.  Id.  Dr. Dassa assessed that Patterson had a lateral meniscal tear in her right knee and concluded, "PT is suffering from consequential right knee pain due to left knee work related injury.  She has had 2 surgeries and has been having pain due to favoring.  She has been symptomatic since her left knee treatment and these symptoms have worsened.  She requires right knee surgery.  The right knee needs to be accepted as a consequential injury to the left.  She will be followed up when it is accepted."  Id.

Patterson also submitted reports that were jointly completed by Dr. George Stivala and registered physician assistant Richard Cohen.  The first is a Workers' Compensation Follow-Up Evaluation completed on July 31, 2012.  R. 102-03.  Dr. Stivala explained that Patterson reported "continued improvement in her left knee" but that she was "having right knee pain and buckling and is awaiting authorization for treatment of the right knee including arthroscopy."  R. 103.  Dr. Stivala assessed, "[p]hysical examination reveals well-developed, well-nourished female in mild distress."  Id.  With regard to the left knee, Dr. Stivala recognized that there were "healed wounds" but that there was still some tenderness and atrophy in the quadriceps musculature.  Id.  With regard to the right knee, Dr. Stivala made the following findings: "Evaluation of the right knee reveals a range of motion measured at 0-115 degrees.  There is a moderate effusion.  There is tenderness in the medial joint line.  There is tenderness in the lateral joint line.  There is a positive McMurray's sign.  There is a negative Lachman examination.  There is no calf tenderness.  There is a negative Homan's sign."  Id.  He then reviewed an MRI examination of the right knee and found "evidence of a tear of the lateral meniscus," "evidence of a possible tear of the medial meniscus," and "evidence of a chondral injury in the lateral tibial plateau."  Id.  Based on these results, Dr. Stivala made the following conclusions:

> My impression is that Ms. Patterson suffers from pain, weakness and restriction in motion and strength after left knee arthroscopy.  She understands that she is also suffering from an incompetent anterior cruciate ligament and she may be candidate for anterior cruciate ligament reconstruction . . . . She is also suffering from right knee pain secondary to a torn meniscus and symptomatic chondral injury sustained as the result of overuse from her prolonged left knee injury.  Authorization for treatment of the right knee is requested including right knee arthroscopy . . . . She should continue a course of physical therapy.

Id.  Dr. Stivala recommended that physical therapy was "medical[ly] necessary to decrease pain, improve range of motion and strength, improve functioning and decrease the need for medications."  R. 102-03.  He also refilled her prescription for Mobic.  R. 102.  Finally, Dr. Stivala assessed that Patterson "is temporarily totally disabled from her job duties" and recommended that she "return for reevaluation in three to four weeks."  Id.

The next document completed by Dr. Stivala is an "Attending Doctor's Request for Authorization" form from August 3, 2012.  R. 97-98.  In this form, Dr. Stivala requested that the New York Workers' Compensation Board authorize the following medical services to treat Patterson's right knee condition: physical therapy three times per week for twelve weeks, a right knee arthroscopy surgery, and post-surgery physical therapy for three times per week for twelve weeks.  R. 97.  Dr. Stivala indicated on the form that he believed that the incident that Patterson claimed as the cause of her injuries was in fact the medical cause of her injury, that Patterson's complaints were consistent with the history of that injury, that Patterson's alleged history of the injury was consistent with his objective findings, and that Patterson was 100% "temporar[ily]" impaired.  R. 98.

On August 10, 2012, Dr. Stivala completed a "Medical Report" to submit to F.E.G.S. and a "Physician's Functional Assessment Form" to submit to the New York City Human Resources Administration.  R. 100-01.  On the F.E.G.S. Medical Report, Dr. Stivala diagnosed Patterson

with "left knee arthroscopy" and "right knee meniscal tear."  R. 100.  He cited the MRI results as "relevant clinical findings" and recommended a clinical course of "physical therapy 3x a week, Mobic as needed, [and] follow up with Dr. once a month."  Id.  Similarly, on the Functional Assessment Form, Dr. Stivala diagnosed Patterson with "left knee arthroscopy" and "R/ knee meniscal tear."  R. 101.  He found that the onset date for this injury was March 2, 2012.  Id. Additionally, he checked off a box indicating that Patterson is "unable to work for at least 12 months (may be eligible for long-term disability benefits)" and wrote in the margins, "Patient is temporarily totally disabled."  Id.

Finally, on January 21, 2013, Dr. Stivala completed a "Doctor's Progress Report" of Patterson's right knee condition.  R. 9-10.  Dr. Stivala made the following diagnoses: "old disruption of ACL, chonoromalacia, and primary LOC osteoarthros lower leg."  R. 9.  He wrote on the form that Patterson's level of "temporary" impairment was 100% and checked a box indicating that it was unknown how long the work restrictions would apply.  R. 10.

In an attached note dated January 16, 2013, Dr. Stivala acknowledged that Patterson reported to him that "she is having continued pain in both knees 8/10 on most days," that "she has difficulty trying to stand from a seated position," that she has "difficulty ascending and descending stairs," and that there is "marked restriction in motion when she is flexing the knee." R. 7.  After examining Patterson, Dr. Stivala made the following findings: "Physical examination reveals a shuffling type of gait with an antalgic component on the right lower extremity.  Range of motion is measured at 0-105 degrees.  There is tenderness in the medial joint line and lateral joint line.  There is a positive McMurray's sign.  She is unable to squat.  There is no calf tenderness.  There is negative Homan's sign."  Id.  With regard to Patterson's left knee, he assessed that she had "healed wounds" but that there was still some "moderate atrophy in the

quariceps musculature." Id.  With regard to Patterson's right knee, he found that "[r]eview of an MRI examination of the right knee reveals evidence of a tear of the lateral meniscus.  There is evidence of a possible tear of the medial meniscus.  There is evidence of a chondral injury in the lateral tibial plateau." Id.  Based on these findings, Dr. Stivala recommended that Patterson continue physical therapy, that she undergo the right knee arthroscopy, that she continue taking anti-inflammatory medication, and that she continue treatment with Dr. Dassa.  R. 7-8.  He concluded by stating that Patterson "is temporarily totally disabled from her job duties."  R. 8.

### 2.    The Appeals Council's Decision

On April 22, 2013, the Appeals Council denied Patterson's request to review the ALJ's decision.  R. 1-4.  The Appeals Council noted that it had "looked at" the additional evidence that Patterson had sent it, including Dr. Dassa's May 2012 report and Dr. Stivala's July 2012, August 2012, and January 2013 reports.  R. 2.  However, it ultimately concluded that this additional evidence "does not affect the decision about whether [Patterson was] disabled beginning on or before April 5, 2012," because "[t]his new information is about a later time." Id.  The Appeals Council then stated in its letter to Patterson, "[i]f you want us to consider whether you were disabled after April 5, 2012, you need to apply again.  We are returning the evidence to you to use in your new claim." Id.

## II.    APPLICABLE LAW

### A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28

13

(2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n. 9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citation and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

      B.       Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the

claimant must be found disabled regardless of his age, education, or work experience.  Id.
§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of
the listed impairments, the Commissioner must review the claimant's residual functional
capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past,
i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or
she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the
Commissioner must decide if the claimant's residual functional capacity permits the claimant to
do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she
will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final
one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue,
566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

Patterson has raised no specific challenge to the ALJ's decision.  Accordingly, we will
review it to determine if it is supported by substantial evidence as required by 42 U.S.C.
§ 405(g).  Additionally, we will examine whether the new information submitted to the Appeals
Council requires remand — a circumstance also contemplated in 42 U.S.C. § 405(g).

A.      Substantial Evidence

The ALJ's decision makes a number of factual determinations.  We begin by considering
whether there is substantial evidence in the record supporting the ALJ's finding that none of
Patterson's impairments, taken individually or in combination with each other, meet or
medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1.  R. 83.  Specifically, the ALJ determined that Patterson's "knee impairment does
not meet listing 1.02A because her ability to walk has not been markedly affected."  Id.  The

16

ALJ explained that although Patterson "has had difficulty walking[,] . . . she has never been prescribed an assistive device and nevertheless is able to walk her children to school . . . In fact, as the FEGS report indicated in 2010, [Patterson] traveled independently by public transportation and completed all of her activities of daily living." Id.

Listing 1.02 concerns "[m]ajor dysfunction of a joint . . . [c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.  A person qualifies as disabled under this provision if he or she has dysfunction of "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." Id. § 1.02(A).  An "inability to ambulate effectively" has been defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. § 1.00(B)(2)(b)(1).  The regulations further explain:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living [and] must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. § 1.00(B)(2)(b)(2).

As the ALJ noted in his opinion, there is ample evidence in the record demonstrating Patterson's ability to ambulate effectively.  Most importantly, Patterson testified at the ALJ hearing that she walks her daughter to school in the morning and that she walks back to the

school in the afternoon to bring her daughter home.  R. 170-71, 286, 289.  Given that Patterson

walks back and forth to her daughter's school twice a day and that the school is three blocks

away from Patterson's house, R. 170, Patterson walks at least twelve blocks on a daily basis.

When asked by the ALJ if she had any problems walking to the school, Patterson replied,

"Sometimes.  You know, sometimes it take me longer to get to the school, but I just take my

time to get there."  R. 171.  When questioned whether, in general, she had any problems

walking, Patterson responded, "No.  The only think [sic] I would say is that the pain, when it

comes, I feel it more in the knee as it bends.  So as I'm walking I can feel the pain, but I just – I,

you know, I don't have a choice but to tolerate it."  Id.  Patterson also testified that she owns a

walking cane but that she only uses it periodically and tries not to depend on it.  R. 168.

Moreover, Patterson stated in her application for benefits that, despite her knee pain, she does

grocery shopping and uses public transportation.  R. 289.  Thus, there was substantial evidence

supporting the conclusion that, although Patterson's knee injury causes her minor pain when she

walks long distances, it does not constitute "an extreme limitation" on her ability to walk or

"interfere[ ] very seriously" with her ability to complete activities.  See 20 C.F.R. Pt. 404, Subpt.

P, App. 1 § 1.00(B)(2)(b)(1).

Patterson's ability to walk effectively is further supported by the objective medical

evidence in the record.  For example, consultative orthopedic surgeon Dr. Isaac Cohen

concluded after evaluating Patterson that she "ambulated with a normal gait, without the use of

any assistive devices," that she "was able to heel toe walk with a normal gait," and that "[n]o

instability was noted."  R. 400-01.  Likewise, Dr. Barbara Akresh found that Patterson's gait was

normal, that she could walk on her heels and toes "without difficulty," that she "[u]sed no

assistive devices," and that she "[n]eeded no help changing for exam or getting on and off [the]

exam table." R. 1001. From this, Dr. Akresh concluded that Patterson had only "mild limitations in her ability to climb steps and ambulate long distances." R. 1003.

Thus, because both Patterson's testimony and the objective medical evidence strongly suggest that Patterson does not have an "inability to ambulate effectively," we find there to be substantial evidence to support the ALJ's conclusion that listing 1.02 does not apply.

We also find substantial evidence to support the ALJ's finding that Patterson's depression is a "non-severe impairment." R. 82. Under the applicable regulations, an impairment is considered to be "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). When Patterson began seeing psychiatrist Dr. Francisco Rodriguez on January 7, 2010, she reported having mood swings, having low motivation and energy levels, being irritable, having trouble with social interaction, and having cut herself once or twice in the past. R. 686-87. Dr. Rodriguez found Patterson to be "guarded but cooperative" and "depressed." R. 687. Dr. Rodriguez found her speech and cognitive abilities to be essentially normal but noted that she had reported "getting easily distracted" and having trouble remembering recent events. R. 688. From this initial assessment, he diagnosed Patterson with bipolar disorder, post-traumatic stress disorder, and borderline personality disorder and recommended that Patterson undergo both individual and family therapy. R. 689-90. While Dr. Rodriguez's records indicate that Patterson suffers from medically discernable psychological issues, Dr. Rodriguez has never opined on how these conditions would affect Patterson's ability to work or perform basic job functions. Subsequent records from Patterson's therapist, Nakyung Shin, indicate that Patterson has had parenting and relationship difficulties and that she has struggled with emotional issues stemming from her

history as an abuse victim.  R. 714-26.  However, these records do not discuss to what extent, if

any, such emotional issues would interfere with Patterson's ability to rejoin the workforce.

The reports submitted by the F.E.G.S. medical team and by consultative psychiatric

examiner Dr. Dmitri Bougakov suggest that Patterson's psychological and emotional issues have

not significantly limited her ability to work.  A F.E.G.S. Biopsychosocial Summary dated

November 2, 2010, assigned Patterson a PHQ-9 score of 6, indicating only minor depression,

and noted that Patterson's psychological issues made it only "[s]omewhat"difficult for her to

"work, take care of things at home, or get along with other people."  R. 367.  Even Patterson

acknowledged during the F.E.G.S. examination that she would be "able to work at this time with

accommodations for her knee conditions."  R. 369.  Similarly, Dr. Bougakov opined that

Patterson "does not present with any significant vocational difficulties and no significant

difficulties were elucidated during this evaluation."  R. 998.  He assessed that Patterson's

psychological problems are not "significant enough to interfere with [her] ability to function on a

daily basis."  Id.

Given Dr. Bougakov's clear opinion that Patterson's psychological issues would not

affect her ability to work, together with the lack of evidence to the contrary, we find that there is

substantial evidence in the record supporting the ALJ's conclusion that Patterson's depression is

a non-severe impairment.  This finding is further supported by Patterson's own testimony at the

ALJ hearing admitting that she was no longer receiving any psychiatric treatment and was not

taking any medication for her mental conditions.  R. 165-66.

We next consider whether there is substantial evidence to support the ALJ's finding that

Patterson "has the residual functional capacity ['RFC'] to perform sedentary work as defined in

20 C.F.R. 404.1567(a) and 416.967(a) but that she cannot engage in any significant bending or stooping." R. 83. Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404 .1567(a), 416.967(a); accord Halloran v. Barnhart, 362 F.3d 28, 31 n. 3 (2d Cir. 2004).

For largely the same reasons that we determined there to be substantial evidence to support the ALJ's finding that Patterson's knee injury does not qualify under the "[m]ajor dysfunction of a joint" listing, we also find that there is substantial evidence to support the ALJ's finding that Patterson retains the RFC to perform sedentary work with certain limitations. In explaining how he came to this conclusion, the ALJ highlighted copious amounts of objective medical evidence in the record showing that Patterson's left knee injury does not greatly limit her ability to walk or to live an active lifestyle. R. 84-89. As noted by the ALJ, R. 84, the records provided by Dr. Paul Kleinman and Dr. Imelda Cruz-Banting, both of whom treated Patterson in the fall of 2008 soon after her left knee injury had occurred, strongly suggest that her condition does not preclude her from working. For example, in a letter dated November 4, 2008, Dr. Kleinman noted that the MRI results exhibited "some cysts anterior to the lateral meniscus but no definite tear" and that Patterson "will try going back to work on November 10." R. 339. Overall, he assessed that Patterson was partially disabled from her regular job duties but did not consider whether her condition would prevent her from doing a sedentary job. R. 340. Similarly, in October 2008, Dr. Cruz-Banting found that Patterson was "temporarily totally

21

disabled in relation to present job description." R. 394. While these records suggest that Patterson would have difficulty returning to her home health aide job, this is not inconsistent with the ALJ's findings given that the ALJ agreed that Patterson is "unable to perform any past relevant work." R. 89. Nonetheless, even if a person with Patterson's medical condition could not work as a home health aide — a medium exertion level job requiring significant amounts of walking and lifting, R. 176 — that person might be able to perform a sedentary job.

The treating physician reports provided by Dr. Michael Palmeri similarly suggest that Patterson is able to perform sedentary work. In February 2009, Dr. Palmeri found Patterson to have a "moderate partial disability" due to her knee pain, R. 974-75, and concluded that Patterson was "temporarily" unable to perform her job duties as a home health aide, R. 976-77. But he reached this conclusion only because he assumed that "walking and kneeling" were "parts of the duties of her job." Id. Later reports from Dr. Palmeri show that, after the left knee arthroscopy was performed in June 2009, Patterson's medical condition improved significantly. For example, in a report dated August 13, 2009, Dr. Palmeri acknowledged that Patterson had "note[d] that her left knee continues to improve." R. 869. He further assessed, "[e]valuation of the left knee reveals healed wounds. There is no evidence of infection. Range of motion is measured at 0-115 degrees. There is mild tenderness . . . There is no varus or valgus laxity . . . There is a continued improvement in quadriceps and adductor musculature strength." Id. From this, Dr. Palmeri concluded, "[m]y impression is that Ms. Patterson is improving after left knee arthroscopy." Id.

The consultative medical examiner reports provide additional support for the ALJ's RFC findings. In November 2008, Dr. Isaac Cohen, an orthopedic surgeon, examined Patterson and found only "mild swelling" of the left knee, with "full" extension, "no medial or lateral

22

instability," and only "[m]ild tenderness."  R. 413.  Dr. Cohen noted that Patterson walked "with

a normal gait."  R. 412.  From this, he diagnosed Patterson with internal derangement of the left

knee and concluded that she had a "mild partial orthopedic disability."  R. 413.  When Dr. Cohen

examined Patterson again in February 2009, he found that her "[m]uscle strength of the lower

extremities [was] normal with no noted atrophy . . . Reflexes were present, equal and

symmetrical in the patellae and Achilles.  [She] was able to heel toe walk with a normal gait and

was able to stand on her heels and tip toes without difficulty."  R. 409.  Dr. Cohen gave her a

"good" prognosis and concluded that she had a "mild partial orthopedic disability" but that she

was "capable of returning to work on a light duty basis with restrictions of no excessive walking,

no climbing and no kneeling."  Id.  Upon examining her again in September 2009, several

months after the left knee arthroscopy was performed, Dr. Cohen assessed that she had a

"moderate partial orthopedic disability" and that she "could perform at a sedentary job position."

R. 405.  These medical records provide strong support for the ALJ's findings as to Patterson's

RFC to perform sedentary work.  Moreover, the most recent report in the record from Dr. Cohen

reflects an improved prognosis for Patterson's condition.  In August 2010, Dr. Cohen reported

that "Patterson has no objective evidence of an ongoing orthopedic disability," that her "overall

prognosis is good," and that she "is capable of returning to her normal work activities without

any restrictions."  R. 401.  This opinion is consistent with the ALJ's RFC assessment that

Patterson can perform sedentary work.  The consultative report of Dr. Barbara Akresh further

bolsters the ALJ's RFC findings.  In January 2011, Dr. Akresh gave Patterson a good prognosis

for her knee injury, concluding that she had only "mild limitations in her ability to climb steps

and ambulate long distances."  R. 1003.

Thus, the records supplied by both Patterson's treating physicians and by the consultative medical examiners provide substantial evidence to support the ALJ's conclusion that, despite Patterson's left knee injury, she retains the RFC to do sedentary work.  Furthermore, as explained above, Patterson's admitted activities of daily life strongly suggest that her condition has not greatly limited her ability to ambulate effectively.  Indeed, the fact that Patterson walks her daughter to and from school on a daily basis, R. 170, 286, 289; that she goes grocery shopping and uses public transportation, R. 289; and that she is capable of taking care of five children and performing various household chores, R. 286-88, all suggest that she is able to meet the exertional demands of sedentary work.

Additionally, there is substantial evidence to support the ALJ's conclusion that none of Patterson's other medical conditions are sufficiently severe to preclude her from performing sedentary work.  While Patterson mentioned headaches during her testimony before the ALJ, she testified that "they just pretty much seem to come and go" and that she "stopped taking the medication" she had been prescribed.  R. 169-70; see also R. 995 (treating record where Dr. Bloch notes that the medication "seem[ed] to be controlling the headaches well").  Also, as previously explained, Dr. Bougakov's opinion that Patterson's psychological problems are not "significant enough to interfere with [her] ability to function on a daily basis," R. 998, combined with Patterson's active lifestyle in taking care of her five children, provided the ALJ with substantial evidence to conclude that Patterson has the RFC to perform sedentary work despite having been diagnosed with various psychological conditions such as depression.

Finally, the ALJ properly determined that "[c]onsidering [Patterson's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Patterson] can perform."  R. 90.  The vocational expert testified

that various unskilled sedentary jobs exist that a person with Patterson's limitations, including her restrictions on stooping and bending, would be capable of performing.  R. 176.  The vocational expert used the DOT to opine that Patterson could work as a clerical worker, an assembler, or an order clerk, all of which are jobs that exist in significant numbers in the national economy.  R. 176-77.  The ALJ properly relied on the vocational expert's testimony regarding this issue.  See Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (vocational expert's testimony on the availability of such sedentary jobs provided substantial evidence for the ALJ's finding on this issue); accord Santos v. Comm'r of Soc. Sec., 2013 WL 5883345, at *7 (S.D.N.Y. Oct. 28, 2013).  In sum, there is substantial evidence to support the ALJ's finding that there existed substantial gainful employment that Patterson would be capable of performing.

### B.    Additional Evidence Submitted to Appeals Council

 In an order dated March 10, 2014, we asked the parties to address the question of "whether the additional documents provided to the Appeals Council — although created after the ALJ's decision was issued — provided pertinent information regarding Patterson's right knee condition during the period prior to April 5, 2012, the date of the ALJ's decision," and if so, whether the Appeals Council failed to properly consider such evidence.  See Order at 2.  In addressing this issue, the Commissioner admitted that the Appeals Council "erred in failing to consider the 2012 and 2013 records from Dr. Stivala and Dr. Cohen because they appear to relate to a right knee injury that predated the ALJ's decision."  3/17/14 Letter at 4.  Nevertheless, the Commissioner contends that "this error does not require remand because those records do not create a reasonable probability that the ALJ would have or should have ruled differently."  Id. The Commissioner further argues that Dr. Stivala's conclusion that plaintiff was temporarily disabled is "not entitled to deference . . . [because] the final responsibility for determining the

residual functional capacity and disability of a claimant is reserved to the Commissioner, not to physicians." Id. at 5 (citing cases). We agree that the Appeals Council's refusal to consider the additional evidence does not require remand because there is not a reasonable possibility that the ALJ would have decided Patterson's case differently had he been presented with this evidence.

The Appeals Council is obligated to consider "new and material" evidence that "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); accord Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). A court may order that a case be remanded to the Commissioner to consider additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized this three part showing as follows:

> [A]n appellant must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, . . . and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . . . The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently . . . . Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (citations and internal quotation marks omitted) (first bracket in original).

First, we find that the reports of Dr. Stivala and Dr. Dassa contain "new" evidence that is "not merely cumulative of what is already in the record." Id.; accord Skuza v. Astrue, 2010 WL 184434, at*2 (W.D.N.Y. Jan. 15, 2010) ("The Second Circuit has held that new evidence is evidence which is not cumulative."). Specifically, the Dr. Stivala and Dr. Dassa reports discuss Patterson's right knee injury — a medical condition that was not examined at all in the medical records that were before the ALJ. Indeed, Patterson's right knee injury is not even mentioned in

the ALJ's decision.  R. 79-91.  Second, we find that Patterson has "good cause" for failing to present this evidence sooner given that these reports were not in existence at the time that the ALJ issued his decision.  See Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) ("Because the new evidence submitted by [the applicant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ."); accord Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010).

The only question that remains is whether the Dr. Stivala and Dr. Dassa reports are "material" — that is, whether they are "both relevant to the claimant's condition during the time period for which benefits were denied and probative."  Lisa, 940 F.2d at 43.  As an initial matter, it is clear that the reports are relevant to Patterson's disability claim.  While these reports contain medical findings that were taken after the ALJ's decision was issued, they nonetheless provide insight into Patterson's right knee injury as it existed prior to the ALJ's decision.  They reflect that the right knee injury existed several months before the ALJ's decision was issued.  Indeed, Patterson testified at the ALJ hearing that she had started having right knee pain about six months beforehand, that a meniscus tear had been found in her right knee, and that she planned to have surgery performed on the right knee.  R. 171-72.  Thus, this is not a case where the medical condition discussed in the additional evidence did not arise until after the ALJ's decision was issued.  See, e.g., Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 258 (S.D.N.Y. 2010) (finding that the Appeals Council properly refused to consider as "new evidence" a medical report in which the applicant was diagnosed with emphysema because there was "no evidence or even allegation in the record that [the applicant] was suffering from emphysema before the date of the ALJ's decision").

Indeed, some of the information in the Dr. Stivala and Dr. Dassa reports pertains directly to the condition of Patterson's right knee injury during the relevant time period.  For example, Dr. Dassa's report indicates that this injury stems from Patterson "favoring" her right knee after she received surgery on her left knee in June 2009, that the right knee pain "became severe in 2009," and that it was currently causing "severe dysfunction."  R. 74.  Additionally, Dr. Dassa's report states that on July 11, 2011, approximately nine months before the ALJ's decision was issued, Patterson had an MRI of the right knee which found that she had a tear of the lateral meniscus.  Id.  Furthermore, Dr. Dassa's post-examination assessment that Patterson's right knee injury required surgery, id., relates to the relevant time period because it "reveals the depth of an illness recognized, but not fully appreciated at the time of the hearing."  Bosmond v. Apfel, 1998 WL 851508, at *12 (S.D.N.Y. Dec. 8, 1998); see also Richardson v. Apfel, 44 F. Supp. 2d 556, 562 n. 3 (S.D.N.Y. 1999).  Thus, the conclusions of Dr. Dassa, and to a lesser extent Dr. Stivala, provide objective medical evidence supporting Patterson's claims at the ALJ hearing about her right knee injury.

As to whether this information is "probative," this requirement has been interpreted to mean that there must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently."  Lisa, 940 F.2d at 43; accord Santiago v. Comm'r of Soc. Sec., 2009 WL 2496583, at *12 (E.D.N.Y. Aug. 14, 2009) (same).  After reviewing the ALJ's opinion in conjunction with the additional evidence, the Court finds that the Dr. Dassa and Dr. Stivala reports are not probative because there is no reasonable possibility that the ALJ would have decided Patterson's claims differently had he been presented with this additional medical evidence concerning Patterson's right knee injury.

As previously discussed, the ALJ's determination as to Patterson's RFC to perform sedentary work was largely based on Patterson's own hearing testimony indicating that she has maintained a relatively active lifestyle and that she is capable of walking significant distances without much difficulty.  Specifically, the ALJ found that by Patterson's "own account, [her] activities of daily living have remained intact and are completely consistent with sedentary exertion."  R. 84, 88.  This finding was supported by Patterson's testimony that she walks several blocks to her daughter's school multiple times a day, R. 170; that her knee pain is "fine" when the "Percocet kicks in," R. 169; that she uses a walking assistive device only "periodically," R. 168; and that she is able to independently travel by public transportation, R. 163.  Additionally, the ALJ stated that Patterson's testimony "that she had a little pain on walking and had no problem sitting or standing" was "[m]ost instructive" as to his conclusion that she can do sedentary work.  R. 89.  Because this testimony was given at a time when Patterson's right knee injury had already appeared, R. 171-72, there is no possibility that the ALJ would have reached a different result had he been presented with the additional medical evidence concerning Patterson's right knee condition.  In other words, because Patterson essentially admitted that, when she was suffering from both the left and the right knee injuries, she was nonetheless capable of maintaining an active lifestyle and ambulating effectively, the additional evidence demonstrating that the right knee injury existed would not have changed the ALJ's view that Patterson had the RFC to do sedentary work.

Finally, to the extent that Dr. Stivala's opinion in August 2012 that Patterson was "temporarily totally disabled," R. 98, 101, is inconsistent with the ALJ's opinion, we note that Dr. Stivala did not assert this opinion until August 2012, approximately four months after the ALJ's decision was issued.  Thus, it doubtful that this particular opinion relates to the relevant

time period.  Moreover, it is well-established that the Commissioner is not bound by a physician's opinion that a claimant is disabled.  <u>See</u>, <u>e.g.</u>, <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work — [is] reserved to the Commissioner.") (citation and internal quotation marks omitted); <u>Francois v. Astrue</u>, 2010 WL 2506720, at *5 (S.D.N.Y. June 21, 2010) (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.")).

Overall, because Patterson's hearing testimony concerning her level of activity and ability to walk effectively strongly suggests that she has the RFC to perform sedentary work we conclude that there is no reasonable possibility that the ALJ would have reached a different result had he been presented with the additional medical evidence.  Therefore, we find no reason to remand Patterson's case.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 11) is granted.  The Clerk is requested to enter judgment dismissing this case..

Dated: June 6, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Nikimia Patterson
4828 Robertson Street, Apt. # 2
Bronx, NY 10470

Counsel by ECF

31